IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH HERNY THORNTON | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of Social Security, | : | No. 12-2524 |
| Defendant. | : | |

**MEMORANDUM RE:  Request for Review**

**Baylson, J.**                                                                                                           **February 7, 2013**

**I.     Introduction**

Claimant Joseph Henry Thornton seeks judicial review of a decision by the Commissioner of the Social Security Administration ("the Commissioner") denying his applications for Supplemental Security Disability Insurance Benefits ("SSDI") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-33, 1381-83(f).  After careful consideration of all the relevant facts and circumstances, and for the reasons below, Thornton's Request for Review of the April 14, 2010 decision of the Administrative Law Judge ("ALJ") is DENIED, and his Complaint is DISMISSED with prejudice.

**II.    Background**

   **A.  Procedural History**

On March 31, 2006, Thornton filed applications for SSDI and SSI.  (Tr. 113.)  Both applications alleged disability beginning on October 9, 2005, due to chronic back pain, arthritis of the back and hands, major depression, and Hepatitis C.  (Id. at 116.)  Both applications were

denied on September 19, 2006. (Id. at 105.) Thornton then filed a timely request for a hearing on October 24, 2006. (Id. at 146.) On March 11, 2008, a hearing was held before ALJ Richard A. Kelly, at which Thornton was represented by counsel and testified on his own behalf. (Id. at 32, 113.) A medical expert and vocational expert also testified at the hearing. (Id.)

On April 25, 2008, ALJ Kelly denied Thornton's applications for benefits. (Id. at 110.) Thornton subsequently sought review of the decision before the Appeals Council. (Id. at 128.) While the Appeals Council review was still pending, Thornton filed a second set of applications for SSDI and SSI, dated May 5, 2008. Both applications alleged disability beginning April 26, 2008, due to the same impairments alleged in his original applications. (Id. at 130.) These applications were granted on October 24, 2008. (Id. at 128.)

On August 18, 2009, the Appeals Council granted Thornton's review based on new material and evidence. (Id. at 128-30.) The Appeals Council also reopened the favorable determination of his May 5, 2008 applications, because it apparently conflicted with ALJ Kelly's April 25, 2008 denial of benefits, and the later favorable determination was not supported by "any specific clinical or laboratory findings." (Id. at 130.) Thornton's claims were combined and sent back to ALJ Kelly for a new, consolidated hearing. (Id. at 129.)

The second hearing was held on January 11, 2010. (Id. at 23.) Thornton testified on his own behalf and was represented by counsel. (Id.) A medical expert and a vocational expert also testified at the hearing. (Id.)

On April 14, 2010, ALJ Kelly denied Thornton's claims. (Id. at 20.) ALJ Kelly's second decision incorporated by reference his first decision "as it related to all medical evidence prior to the amended alleged onset date." (Id. at 23.) Thornton sought review of the second decision on April 26, 2011. (Id. at 5-6.) On March 26, 2012, the Appeals Council denied his appeal. (Id. at

1.)  ALJ Kelly's decision thus stands as the final decision of the Commissioner.  See Matthews v. Apfel, 239 F.3d 589, 592 (3d Cir.2001).

On May 11, 2012, Thornton commenced the instant action by filing a Complaint (ECF 3) requesting review of ALJ Kelly's decision.  On August 31, 2012, Thornton filed a Brief and Statement of Issues in Support of Request for Review (ECF 8).  On October 31, 2012, the Commissioner filed a Response (ECF 13) in opposition thereto.  On November 12, 2012, Thornton filed a Reply in further support of his Request for Review (ECF 14).

    **B.**    **The ALJ's Decision**

In a written decision, ALJ Kelly denied Thornton's applications on the basis that he has the residual functional capacity ("RFC") to perform "medium work," and, although Thornton cannot perform all or substantially all of the requirements of medium work, there are jobs that exist in significant numbers in the national economy that Thornton can perform.  (Tr. at 23-31.)

    **1.**    **RFC Assessment**

The ALJ found that Thornton suffers from congenital central canal stenosis, and substance addiction, which is in remission – medically determinable impairments that limit his ability to work and are, therefore, considered to be "severe" under the Social Security Regulations.  ( Id. at 25.)  The ALJ also determined that Thornton suffers from other impairments, including Hepatitis C, hypertension, and substance induced mood disorder.  (Id.)  However, according to the ALJ, these impairments are "non-severe" under the Social Security Regulations because they result in minimal, if any, limitation on his ability to work.  (Id. at 25-26.)

In making his assessment, the ALJ found that Thornton's "medically determinable impairments could reasonably be expected to cause only some of [his] alleged symptoms;

3

therefore, [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with" a RFC for medium work. (Id. at 28.) Regarding Thornton's physical limitations, the ALJ did not fully credit:

1. Thornton's complaints of significant problems with standing, walking, sitting, lifting and carrying, overhead reaching, chronic pain in his back, neck, legs, and hands, as well as drowsiness from his medications (id. at 27, 79-90); or

2. A number assessments by treating and examining sources that document impairments of greater severity than those found by ALJ Kelly (e.g., id. at 406-17, 639-42, 645-49, 653-56),

because they were not substantiated by Thornton's medical records. (Id. at 29.) Specifically, ALJ Kelly noted that Thornton's treatments were conservative; x-rays, MRIs, and other tests either did not corroborate the alleged symptoms or showed only mild or minimal abnormalities, which, while consistent with the alleged symptoms, were inconsistent with their alleged severity. (Id. 28-30.) For example, ALJ Kelly stated that while one assessment "indicated that [Thornton] was capable of performing a range of sedentary exertional activities. . . . this opinion was apparently based upon [Thornton's] complaints and not the essentially normal examination." (Id. at 28.) ALJ Kelly also relied on the testimony of the state medical expert at the second hearing, stating that his testimony supported a RFC for medium work, and noted that the current RFC "is essentially similar to Dr. [Jimmy] Nelson's findings at the first hearing."[1] (Id. at 29.)

Regarding Thornton's mental limitations, ALJ Kelly noted that a Disability Determination Services ("DDS") psychologist reported that Thornton's mental health issues "resulted in moderate limits" regarding "understand[ing], remember[ing] and carry[ing] out detailed instructions, perform[ing] activities within a schedule, maintain[ing] regular attendance and be[ing] punctual within customary tolerances, maintain[ing] attention and concentration, and

---

[1] Dr. Nelson was the medical expert who testified at Thornton's first hearing on March 3, 2008.

. . . respond[ing] appropriately to changes in the work setting." (Id. at 28.) ALJ Kelly also noted that Thornton was given a Global Assessment Functioning ("GAF") score of fifty-five, which indicates moderate symptoms, (id. at 29) his "affect and mood" had improved "without substance use," and medical records from the Philadelphia VA Medical Center, dating from February 27, 2008 through December 10, 2009, showed no "indicat[ion of] any mental health issues subsequent to [Thornton's] abstinence from substances." (Id. at 28-29.) Ultimately, ALJ Kelly found that Thornton does not suffer from any mental limitations.

ALJ Kelly also stated that in reaching his conclusion regarding Thornton's RFC, he "considered the opinions and findings of the State agency medical consultants," assigning them "some probative weight." (Id. at 29-30.) The ALJ did not, however, provide any specifics as to the effects of these opinions and findings on his conclusion.

### 2. Jobs in the National Economy

Based on the testimony of the vocational expert, ALJ Kelly found that Thornton could perform the jobs of ambulance driver and machinist.[2] (Id. at 31.) According to the vocational expert there are 400 local and 21,000 regional jobs for ambulance drivers and 850 machinist jobs in Pennsylvania, in additional to 90,000 nationally. (Id. at 31, 101.)

### C. The Court's Summary of the Record

The two medical experts who testified at the hearings in this case both concluded that the record contained insufficient objective evidence of Thornton's alleged medical conditions to support their alleged severity. For example, Dr. Nelson, who testified at the March 3, 2008 hearing, stated that "the records that I have don't show any physical findings of any significance.

---

[2] ALJ Kelly's decision states that Thornton could perform the job of "driver." (Id. at 31.) However, the vocational expert ALJ Kelly relied on clearly testified about the job of "ambulance driver." (Id. at 101.) Because it is ultimately immaterial to the outcome of Thornton's Request for Review, the Court's discussion assumes that ALJ Kelly was referring to the job of ambulance driver.

. . . these are, these are almost normal for a man his age" (Tr. at 65); and Dr. Ronald Goldman, who testified at the January 11, 2010 hearing, stated that "from an orthopedic point of view, there's nothing here that's been established that is a functional restriction" regarding Thornton's alleged back pain, and "from looking at this record it is not exactly clear what the issues are. . . . it would not be orthopedics based on the available information" regarding the alleged arthritis in Thornton's hands. (Id. at 96-97.) Dr. Nelson nevertheless testified that he agreed with a DDS RFC for medium work dated September 18, 2006, (id. at 65) but Dr. Goldman testified that "I, I can't disagree with [that DDS RFC for medium work] because I don't know what it's based on." (Id. at 97-98.) Dr. Goldman had the same objection to a second DDS RFC dated October 24, 2008. (Id. at 98, 674.)

The record contains a number of evaluations of Thornton's physical limitations, by both treating and examining doctors, the majority of which indicated limitations much more severe than those found by the ALJ. For example, in January 2008, Dr. Lauran Heyns Mariani reported that Thornton would "constantly" "experience pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks," and described severe limitations, such as being able to stand for only fifteen minute intervals; never twisting, stooping, or crouching; lifting and carrying less than ten pounds occasionally, and using his hands for only ten percent of an eight-hour day. (Id. at 406-09.) Dr. William C. Becker provided a similar evaluation in July of 2008, as did Dr. Raul Yankelevich in October of 2008. (Id. at 639-49.) However, in his October 2008 evaluation, Dr. Yankelevich stated that "[t]he physical findings do not corroborate the many symptoms offered by the claimant in spite of the excessive demonstration of physical incapacities." (Id. at 647.) Also, in an August 2006

evaluation, Dr. Yankelevich noted no abnormalities that would corroborate Thornton's alleged symptoms.  (Id. 334-37.)

The record contains only two assessments of Thornton's mental limitations, neither from treating nor examining doctors.  In September 2006, Dr. Frank M. Mrykalo found that Thornton suffered from polysubstance abuse, but listed no resulting limitations.  (Id. 64, 338, 346, 348.)  In August 2008, John Hower, Ph.D., found that Thornton suffered from a depressive disorder, resulting in "Mild" "Restriction of Activities of Daily Living" and "Difficulties in Maintaining Social Functioning," and "Moderate" "Difficulties in Maintaining Concentration, Persistence, or Pace."  (Id. at 660, 663, 670.)  Dr. Hower stated that Thornton had a "limited" "ability to understand and remember complex or detailed instructions . . . however, he would be expected to understand and remember simple one and two step instructions."  (Id. at 659.)  Dr. Hower also stated that "[s]tress exacerbates [Thornton's] symptoms" and that "he evidences some limitation in dealing with work stresses and public contact."  (Id.)  Nevertheless, Dr. Hower concluded that Thornton "retains the ability to perform repetitive work activities without constant supervision. . . . [and] is able to meet the basic mental demands of competitive work on a sustained basis."  (Id.)

The Court's review of Thornton's medical records shows numerous reports of pain, and that Thornton was prescribed a variety of pain medications.  However, the record also establishes that x-rays, MRIs, and other tests generally revealed either no abnormalities, or abnormalities described as "moderate," "mild," "minimal," or "small."  (E.g., id. at 317, 541, 632, 696, 765-66, 786.)  The only exceptions are found in notes from a rheumatology follow-up visit dated February 9, 2010, which discussed the results of a physical exam, ultrasounds, and an MRI of Thornton's spine.  These notes describe a "very large Heberdon's nodule and mallet deformity"

on the left fifth finger and prominent epidural fat "suggestive of epidural lipomatosis." (Id. at 763, 765-66.) The "Final Assessment/Plan" section and an addendum to these notes provide a diagnosis of "early undifferentiated inflammatory arthritis," although it is apparently unclear whether Thornton "has early inflammatory arthritis such as [rheumatoid arthritis] or polyarthritis from [Hepatitis C] etc. . . . [v]iral load still high so this may still all be [Hepatitis C] related arthritis as well." (Id. at 766.) The record contains no evaluation of Thornton's functional limitations that post-dates these February 9, 2010 rheumatology notes. These notes also post-date the hearings at which the medical experts testified that the record contained insufficient objective evidence to corroborate the alleged severity of Thornton's symptoms.

Thornton's mental health records are unremarkable. His GAF scores ranged from forty-five to fifty-five; the former scores are from December 2006 and January 2007, while the latter scores are more recent, dating May of 2008 and August of 2009. (Id. at 429, 493, 691, 721.) Furthermore, although Thornton has been prescribed medication for his mental health issues, there are no records of total decomposition or hospitalization, and his treating doctors never noted that he suffers from any functional limitations as a result of his mental health issues.

### III.   Legal Standards

#### A.   Jurisdiction

The Social Security Act provides for judicial review by this Court of any "final decision of the Commissioner of Social Security" in a disability proceeding. 42 U.S.C. §§ 405(g), 1383(c)(3). A district court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." Id. When an Appeals Council denies a petitioner's request for review, the ALJ's

decision operates as the Commissioner's final decision for the purposes of judicial review. Matthews, 239 F.3d at 592.

### B.  Standard of Review

On judicial review of the Commissioner's decision, the Commissioner's findings of fact, "if supported by substantial evidence," are conclusive. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Smith v. Comm'r of Soc. Sec., 631 F.3d 632, 633 (3d Cir. 2010) (quotation omitted). It is a standard requiring "less than a preponderance of the evidence but more than a mere scintilla." Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004) (quotation omitted).

In reviewing the record for substantial evidence, however, the Court must "not weigh the evidence or substitute [its own] conclusions for those of the fact finder." Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005) (quotation omitted).

The Court's review of the legal standards applied by the ALJ is plenary. See Allen v. Barnhart, 417 F.3d 396, 398 (3d Cir. 2005).

### IV.  Discussion

Thornton alleges that ALJ Kelly committed reversible error because:

1. An RFC for medium work is not supported by substantial evidence,

2. The record establishes that Thornton does, in fact, suffer from mental limitations, and

3. He relied on vocational expert testimony that conflicts with information in the Dictionary of Occupational Titles (the "DOT").

### A. ALJ Kelly's RFC Assessment for Medium Work Is Supported by Substantial Evidence.

Regarding ALJ Kelly's assessment finding an RFC for medium work, Thornton claims that he committed reversible error by:

1. Failing to properly credit assessments and opinions from treating and examining physicians, as well as sundry medical records evincing greater physical limitations;

2. Relying on an RFC assessment authored by a disability claims adjuster; and

3. Mischaracterizing the testimony of the medical experts as supporting an RFC for medium work.

None of Thornton's attacks on ALJ Kelly's assessment hold water.

An ALJ is not required to credit opinions or assessments, regardless of their source, if they lack support in objective medical evidence. See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011) ("[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations"; "'[t]he law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity'" (alternation in original) (quoting Brown v. Astrue, 649 F.3d 193, 197 n.2 (3d Cir. 2011))); Smith v. Astrue, 359 Fed. App'x 313, 316 (3d Cir. 2009) (even a treating physician's report is only entitled to controlling weight if "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with other substantial evidence [in the] case record.'" (alteration in original) (quoting 20 C.F.R. §§ 404.1527(d)(2))). ALJ Kelly clearly explained that he rejected opinions and assessments finding that Thornton had a RFC below that necessary for medium work because the record contained insufficient objective

medical evidence to substantiate such findings.[3] (Tr. at 29 ("The medical evidence documents some limitations due to [Thornton's] impairments, but few significant findings. . . . The medical record includes essentially normal office examinations, including motor strength, [deep tendon reflexes] and sensory exams.").) ALJ Kelly's appraisal of the record was corroborated by the testimony of both medical examiners.

Furthermore, it is clear from a review of ALJ Kelly's decision that he did not rely on an RFC assessment from a disability claims adjuster. Rather, he relied on his review of the record, the testimony of two medical experts, and Thornton's testimony. As noted above, ALJ Kelly's review of the record revealed a lack of objective medical evidence supporting the alleged severity of Thornton's symptoms, and this finding was corroborated by both medical experts. Furthermore, Dr. Nelson agreed with an RFC for medium work, and while Dr. Goldman indicated that the lack of orthopedic evidence in the record rendered him unable to agree with an RFC for medium work, nothing in his testimony indicates a belief that Thornton suffered from more severe limitations than those found by ALJ Kelly.[4] ALJ Kelly also found that Thornton lacked credibility on points essential to his claims.

---

[3] Thornton emphasizes what he believes to be ALJ Kelly's failure to explain the weight he accorded Dr. Laura Heyns Mariani's opinion. ALJ Kelly's first decision did, in fact, rely on her opinion in determining that Thornton had an RFC for less than sedentary, but credited only her assessment of Thornton's Hepatitis C related limitations, as clearly indicated by his finding that absent these limitations, Thornton would have an RFC for medium work. (Id. at 121, 123-25.) Therefore, ALJ Kelly's finding in his second decision that Thornton's Hepatitis C is now a non-severe impairment, which Thornton does not challenge, fully explains the weight he accorded Dr. Mariani's opinion. (Id. at 25.)

[4] Thornton contends that ALJ Kelly improperly relied on Dr. Nelson's testimony because it was not based on the entire record. However, ALJ Kelly did not rely on Dr. Nelson's testimony as an evaluation of the entire record. Rather, after noting the lack of objective medical evidence supporting the alleged severity of Thornton's symptoms, ALJ Kelly noted that his current RFC for medium work "is essentially similar to Dr. Nelson's findings at the first hearing." (Id. at 29.) Dr. Nelson had cited a lack of objective medical evidence to support Thornton's claims before agreeing with an RFC for medium work. (Id. at 65.)

Thornton also attempts to make hay of the fact that certain records post-dating the hearing at which Dr. Goldman testified appear to:
1. Be the type of evidence Dr. Goldman indicated he would need to form an opinion regarding Thornton's RFC, and

The Court's review of the record revealed no compelling evidence contrary to ALJ Kelly's RFC assessment.  ALJs are entitled to make their own findings based on the record, even if their findings fall "in the middle" of the various medical opinions in the record and testimony.  Accordingly, ALJ Kelly's RFC for medium work is supported by substantial evidence.

### B.    ALJ Kelly Did Not Err Regarding Thornton's Alleged Mental Limitations.

The record contains only a single report finding that Thornton's mental health issues resulted in any functional limitations.  ALJ Kelly explicitly considered this report and was within his authority to reject it based on his review of the record, which showed that Thornton had not suffered from "any mental health issues subsequent to [his] abstinence from substances," (Tr. at 29).  See Chandler, 667 F.3d at 361 (state agency consultants' opinion was subject to evaluation and partial rejection by the ALJ).  The Court's review of the record revealed no compelling evidence contrary to ALJ Kelly's assessment of Thornton's mental limitations.

### C.    ALJ Kelly Did Not Err in Relying on the Vocational Expert's Testimony.

Thornton argues that ALJ Kelly was not entitled to rely on the vocational expert's testimony regarding Thornton's ability to work as an ambulance driver, because he testified that the job requires only medium work, which conflicts with the DOT description of the job as requiring very heavy work.  U.S. Dep't of Labor, DOT, Code No. 913.683-010 (4th ed. rev. 1991).

---

      2.  Show test and exam results that Dr. Goldman indicated would be consistent
          with the types of symptoms alleged by Thornton.  (Tr. at 98, 763-66.)

However, even assuming that Dr. Goldman would find these records helpful, none of them express an opinion as to Thornton's limitations, and, more importantly, Dr. Goldman simply did not testify that the mere existence of this type of evidence would support an RFC for less than medium work.  Furthermore, ALJ Kelly specifically considered these records before noting that Thornton's "complaints were treated conservatively."  (Id. at 29.)  Accordingly, these records are entirely consistent with ALJ Kelly's conclusions that "[w]hile the record supports some of [Thornton's] complaints, there are no findings to support any totally disabling allegations," and "[t]he medical evidence documents some limitations . . . but few significant findings."  (Id.)

The Court need not decide whether ALJ Kelly committed reversible error by failing to recognize and address the conflict between the vocational expert's testimony and the DOT regarding the ambulance driver job.[5] An ALJ need only identify a single job within the claimant's work capacity that exists in sufficient numbers in the national economy. 20 C.F.R. §§ 404.1566(b) ("[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations)" (emphasis added)), 416.966(b) (same). ALJ Kelly identified two such jobs, ambulance driver and machinist, and the record establishes that Thornton can perform the job of machinist.[6]

## V. Conclusion

For the foregoing reasons, and after careful consideration of all of the parties' arguments, Thornton's Request for Review is DENIED, and his Complaint is DISMISSED with prejudice. An appropriate Order follows.

O:\CIVIL 12\12-2524 Thronton v. Astrue\12cv2524.Memo re Request for Review.docx

---

[5] According to 20 C.F.R. §§ 404.1566(d)(1), (e) and 416.966(d)(1), (e), an ALJ is entitled to rely on the DOT and the testimony of vocational experts when determining whether a claimant can perform jobs that exist in significant numbers in the national economy. When relying on both the DOT and vocational expert testimony, an ALJ is required to:
> [A]sk the vocational expert whether any possible conflict exists between the vocational expert's testimony and the DOT, and . . . if the testimony does appear to conflict with the DOT, to "elicit a reasonable explanation for the apparent conflict." . . . [T]he explanation [must] be made on the record and . . . the ALJ [must] explain in his decision how the conflict was resolved.

Burns v. Barnhardt, 312 F.3d 113, 127 (3d Cir. 2002) (quoting Social Security Ruling 00-4p (2000)).

[6] Thornton also argues that ALJ Kelly was not entitled to rely on the vocational expert's testimony regarding both the ambulance driver and machinist jobs, because the record establishes that Thornton suffers from mental limitations that were not included in the hypothetical presented to the vocational expert. Because the Court affirms ALJ Kelly's finding that Thornton does not suffer from any mental limitations, this argument fails.

13